JOURNAL ENTRY AND OPINION
Plaintiff-appellant Edward Hauser ("Hauser"), a self-described "citizen activist" and President of Citizens Vision[1], appeals from the trial court's dismissal of his complaints for writ of mandamus (trial court case No. 391886, filed September 21, 1999) and injunctive relief (trial court case No. 391885, filed September 21, 1999). For the reasons adduced below, we affirm.
A review of the record on appeal indicates that the basis for the writ of mandamus was the allegation by Hauser, a taxpayer and resident of Cleveland, Ohio, that the defendant-appellee Cleveland-Cuyahoga County Port Authority ("Port Authority") failed to comply with R.C. 4582.08 in not announcing and conducting public hearings prior to modifying its official Maritime Facilities Master Plan ("Master Plan").[2] Injunctive relief was sought to prevent the Port Authority from the demolition, disassembly, or removal of certain equipment and structures located on Port Authority property located along Lake Erie near downtown Cleveland, to-wit, four nonfunctioning, obsolete, Hulett iron-ore unloaders ("Huletts"), and their associated electrical power house and accessory support buildings.[3] Defendant-appellee Oglebay Norton Company was added as a party in Hauser's amended complaint for injunctive relief filed September 27, 1999. With reference to Oglebay, Hauser alleged that Oglebay leased land (formerly known as the "CP Ore Dock" at which the Huletts and their support buildings occupy space) at Whiskey Island from the Port Authority and that Oglebay, in 1998, sought permission from the Port Authority to expand the capacity, infrastructure and cargo handling ability at its bulk terminal operations on Whiskey Island, but was advised by the Port Authority to provide an economic impact study and mitigation plan prior to any approval of expansion. Further, Hauser prayed that Oglebay be precluded from demolishing or. removing the Huletts on the property.[4] It is uncontested that Oglebay retained the professional services of URS-Greiner, Inc., to conduct the impact study and prepare a mitigation plan. This November 1998 plan, a copy of which is attached to appellant's brief at Exhibit H, outlined six (6) alternative courses of action (and the feasibility, problems, public access issues, and significant financial costs associated with each alternative) with respect to the Huletts and their support buildings in order to avoid and/or minimize the adverse impact to these historically significant structures. The six courses of action are summarized as follows:
 1. Preserve one to four of the Huletts in their present location. Preserve in place all or some of the buildings within the CP Ore Dock property. Develop and put in place a public interpretive/education program on the history and significance of the CP Ore Dock.
 2. Relocate one to four of the Huletts, in their entirety, to another part of the site. Remove all of the CP Ore Dock property buildings. Perform additional recordation of the property, if warranted, based on a review of earlier Historic American Engineering Record (HAER) documentation (1979). Develop and put in place a public interpretive/education program on the CP Ore Dock at the new location.
 3. Preserve a portion of one Hulett and move this portion to another part of the site. Remove all buildings on the property and the remaining Huletts. Perform additional recordation of the property, if warranted, based on a review of earlier HAER documentation (1979) of the Huletts and associated buildings. Develop and put in place a public interpretive/education program on the CP Ore Dock, at the new location of the Hulett component.
 4. Preserve one or more complete Huletts offsite. Remove remaining Huletts and all buildings. This alternative would include conducting additional recordation of the property, if warranted, based on a review of earlier HAER documentation. In addition, a public interpretive/education program on the CP Ore Dock, would be developed and put in place at the new off-site location.
 5. Preserve a portion of one Hulett and move this portion to an off-site location. Remove all buildings on the property and the remaining Huletts. As with the other alternatives, this alternative would include additional historic recordation, if warranted, and development of a public interpretive/education program.
 6. Demolition and removal of all of the Huletts and buildings. As with the other alternatives, this alternative would include additional historic recordation, if warranted, and development of a public interpretive/education program. This program would occur off-site.
The actions were consolidated by the trial court on October 1, 1999. Subsequent to a preliminary injunction hearing, the trial court denied injunctive relief on October 13, 1999, concluding that irreparable harm and likelihood of success on the merits had not been demonstrated by Hauser. On November 2, 1999, the trial court, without opinion or elucidation utilizing a half-sheet status form order, granted motions to dismiss filed by the Port Authority and Oglebay.
Hauser presents three assignments of error for review. Each of these assignments attack the November 2, 1999 granting of motions to dismiss which rely upon the common basis that notice and hearing requirements were not followed in allegedly amending the Master Plan. These assignments will be discussed jointly.
I
 THE TRIAL COURT ERRED WHEN IT GRANTED DEFENDANT PORT AUTHORITY'S MOTION TO DISMISS THE COMPLAINT IN MANDAMUS FOR FAILURE TO STATE A CLAIM.
II
 THE TRIAL COURT ERRED WHEN IT GRANTED DEFENDANT PORT AUTHORITY'S MOTION TO DISMISS THE AMENDED COMPLAINT FOR INJUNCTIVE RELIEF FOR FAILURE TO STATE A CLAIM.
III
 THE TRIAL COURT ERRED WHEN IT GRANTED DEFENDANT OGLEBAY NORTON'S MOTION TO DISMISS THE COMPLAINT FOR INJUNCTIVE RELIEF FOR FAILURE TO STATE A CLAIM.
The standard of review for a motion to dismiss premised on the application of Civ.R. 12 (B) (6), failure to state a claim for relief, is provided in Spalding v. Coulson (Cuyahoga, 1995),104 Ohio App.3d 62, 75-76:
 * * * a motion to dismiss for failure to state a claim upon which relief can be granted is procedural and tests the sufficiency of the complaint. State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs. (1992), 65 Ohio St.3d 545, 605 N.E.2d 378. It is well settled that "when a party files a motion to dismiss for failure to state a claim, all the factual allegations of the complaint must be taken as true and all reasonable inferences must be drawn in favor of the nonmoving party." Byrd v. Faber (1991), 57 Ohio St.3d 56, 60, 565 N.E.2d 584, 589, citing Mitchell v. Lawson Milk Co.
(1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753, 755-756. While the factual allegations of the complaint are taken as true, "[u]nsupported conclusions of a complaint are not considered admitted * * * and are not sufficient to withstand a motion to dismiss." State ex rel. Hickman v. Capots (1989), 45 Ohio St.3d 324, 544 N.E.2d 639. In light of these guidelines, in order for a court to grant a motion to dismiss for failure to state a claim, it must appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." O'Brien v. Univ. Community Tenants Union
(1975), 42 Ohio St.2d 242, 245, 71 O.O.2d 223, 224, 327 N.E.2d 753, 755.
With respect to this assignment, Hauser argues that the Port Authority unlawfully modified its 1998 Master Plan when, without notice and hearing, it promulgated three subsequent resolutions which affected the continued presence of the Huletts on the lakefront at Whiskey Island. See R.C. 4582.08.[5]
The procedural record in this matter reflects that the Port Authority purchased the CP Ore Docks on Whiskey Island in March of 1997 and then, that same month, leased the premises to Oglebay, who operated the bulk cargo facility.
On May 1, 1998, after providing the required public notice, the Port Authority held a public hearing at which the proposed Maritime Facilities Master Plan was discussed. Hauser admits to having attended this meeting and offering public comments. See complaint in case No. 391886, at paragraph 6.
On June 5, 1998, the Port Authority enacted Resolution 1998-28 which approved, authorized and adopted the Master Plan.[6]
Resolution 1998-28 states in pertinent part the following:
 WHEREAS, pursuant to Ohio Revised Code Section 4582.07, the Board of Directors of the Cleveland-Cuyahoga County Port Authority (the "Port Authority") authorized retaining the services of VZM/TransSystems Corporation ("VZM") to conduct a comprehensive analysis of the Port Authority's maritime capacity and future needs and non-Port related land use issues and to develop a Maritime Facilities Master Plan for the Port Authority; and
 WHEREAS, VZM prepared, on behalf of and at the direction of the Board of Directors of the Port Authority, a plan for future development, construction, and improvement of the Port Authority and its facilities, which plan includes maps, profiles, and other data and descriptions necessary to set forth the location and character of the work to be undertaken by the Port Authority (the "Plan"); and
 WHEREAS, VZM completed such Plan on or about March 12, 1998 (the Plan being denoted as the Cleveland-Cuyahoga County Port Authority Maritime Facilities Master Plan contained in a report titled Port of Cleveland Preliminary Master Plan Report, March 1998) and notice of the completion of the Plan, its availability for public inspection and of a hearing regarding the Plan was given by publication pursuant to Ohio Revised Code Section 4582.07, with such notice being served on the upland adjacent property owners as required by law, as well as Federal, State and local officials and community groups; and
 WHEREAS, a hearing was conducted at the Port Authority pursuant to the notice with over 70 people attending, and with over 20 making public comment on such plan, with written comments being received as well; and
 WHEREAS, after reviewing the written and verbal comments received with respect to the Plan, certain modifications have been proposed and have been attached to the Plan and forwarded to the Board of Directors of the Port Authority (the "Modifications").
 NOW, THEREFORE, BE IT RESOLVED by the Cleveland-Cuyahoga County Port Authority Board of Directors, Cleveland, Ohio:
 Section 1. That the Board hereby ratifies, approves and adopts all actions by the officers and employees of the Port Authority in preparing the Plan, giving notice of the Plan and of the public hearing, conducting of the public hearing, and preparing the Modifications.
 Section 2. The Board of Directors finds and determines that the preparation of the Plan, the publication of its completion and notice of the public hearing, the conduct of the public hearing, and the preparation of the Modifications were activities taken in accordance with Ohio Revised Code Section 4582.07.
 Section 3. The Board of Directors of the Cleveland-Cuyahoga County Port Authority hereby adopts and approves the Plan, along with the Modifications as submitted and attached to such Plan, as the official plan of the Port Authority pursuant to Ohio Revised Code Section 4582.07.
Thereafter, the Port Authority adopted three Resolutions regarding the fate of the Huletts and their support buildings. The first, Resolution 1998-53, was adopted on November 6, 1998, and states in pertinent part the following:
 WHEREAS, the Cleveland-Cuyahoga County Port Authority (the "Port Authority") in March of 1997 purchased the former CP Ore Docks from Conrail; and
 WHEREAS, the CP Ore Docks were leased to a subsidiary of Oglebay Norton Company, and designated the Cleveland Bulk Terminals ("CBT"); and
 WHEREAS, pursuant to the terms of the lease, Oglebay Norton did request the Port Authority to expand the capacity of CBT in order to service the needs of potential new customers; and
 WHEREAS, the Port Authority advised Oglebay Norton that an economic impact analysis and mitigation plan to address the historic designation of CBT would need to be completed before any action could be taken by the Board of Directors with respect to the proposed expansion of capacity of CBT; and
 WHEREAS, Oglebay Norton engaged URS Greiner to conduct such capacity and economic impact study which has been presented to the Board; and
 WHEREAS, URS Greiner and Oglebay Norton further have presented to the Board mitigation plans to be submitted to the Cleveland Landmarks Commission and to the Ohio Historic Preservation Office pursuant to Section 106 of the National Historic Preservation Act.
 NOW, THEREFORE, BE IT RESOLVED by the Board of Directors of the Port Authority, Cleveland, Ohio:
 Section 1. That the study prepared by URS Greiner entitled "The Cleveland Bulk Terminal: An Evaluation of Expanding Capacity and the Economic Impacts" (the "Study") is hereby accepted and approved.
 Section 2. That the Cleveland Bulk Terminal Historic Preservation Mitigation Plans prepared by URS Greiner, Inc. for the Cleveland Landmarks Commission and the Ohio Historic Preservation Office dated November 1998 (the "Plans") are hereby approved and adopted.
 Section 3. That the implementation of the Plans is hereby authorized and approved pursuant to Rules and Regulations set forth by the Cleveland Landmarks Commission, the Ohio Historic Preservation Office and Section 106 of the National Historic Preservation Act.
The second Resolution, Resolution 1999-42, adopted May 14, 1999, stated in pertinent part the following:
 WHEREAS, the Cleveland-Cuyahoga County Port Authority (the "Port Authority") in March of 1997 purchased the former CP Ore Docks from Conrail; and
 WHEREAS, the CP Ore Docks were leased to a subsidiary of Oglebay Norton Company ("ONCO") and designated the Cleveland Bulk Terminals ("CBT"); and
 WHEREAS, pursuant to the terms of the lease, ONCO did request the Port Authority to expand the capacity of CBT in order to service the needs of potential new customers; and
 WHEREAS, the Port Authority advised ONCO that an economic impact analysis and mitigation plan to address the historic designation of CBT would be needed before any action could be taken by the Board of Directors with respect to the proposed expansion of CBT; and
 WHEREAS, ONCO engaged URS Greiner to conduct such capacity and economic impact study which was accepted and approved by the Board of Directors of the Port Authority on November 6, 1998 by Resolution No. 1998-53, and was subsequently submitted to the Cleveland Landmarks Commission and the Ohio Historic Preservation Office pursuant to Section 106 of the National Historic Preservation Act; and
 WHEREAS, since that time the Port Authority and ONCO have attended numerous public meetings with the City Landmarks Commission and interested parties in order to secure agreement on an amended mitigation plan; and
 WHEREAS, the Board of Directors has been presented with an Amended Mitigation Plan for CBT (the "Amended Plan") which is contingent upon the Cleveland Landmark Commission's approval at its June 10, 1999 meeting.
 NOW, THEREFORE, BE IT RESOLVED by the Cleveland-Cuyahoga County Port Authority Board of Directors, Cleveland, Ohio:
 Section 1. That the Amended Plan to provide for disassembly and storage of one complete Hulett, contingent upon the acceptance of the Amended Plan, and subsequent Memorandum of Understanding to implement the Amended Plan, by the Cleveland Landmarks Commission at its June 10, 1999 meeting, be and hereby is approved, authorized and adopted.
 Section 2. That an expenditure of $37,000 is hereby authorized by way of payment to ONCO to reimburse ONCO for a portion of the cost incurred for the development and implementation of the Amended Plan, to be paid from the funds appropriated for Capital Improvements.
 Section 3. That the implementation of the Amended Plan is hereby authorized and approved pursuant to the Rules and Regulations set forth by the Cleveland Landmarks Commission, the Ohio Historic Preservation Office and Section 106 of the National Historic Preservation Act.
On July 8, 1999, the City of Cleveland Landmarks Commission granted a Certificate of Appropriateness via an amended mitigation plan for the following actions: (1) demolition and removal of two of the Huletts; (2) the disassembly and storage of one Hulett with related shunt engines and trackage and their retention on-site for up to five years so as to enable the reassembly of the equipment at a suitable interpretive site within the Flats Oxbow Business Revitalization District in downtown Cleveland; (3) demolition and removal of the electrical power house and all support buildings.[7]
The third Port Authority Resolution, Resolution 1999-53, which was adopted on July 16, 1999, and authorized and adopted the Landmarks Commission amended mitigation plan and provided funds to implement same, provides the following in pertinent part:
 WHEREAS, the Cleveland-Cuyahoga County Port Authority (the "Port Authority") in March of 1997 purchased the former CP Ore Docks from Conrail and leased the same to a subsidiary of Oglebay Norton Company ("ONCO"), which facility is now designated as the Cleveland Bulk Terminals ("CBT"); and
 WHEREAS, pursuant to the terms of the lease, ONCO requested the Port Authority to expand the capacity of CBT in order to service the needs of potential new customers; and
 WHEREAS, the Port Authority advised ONCO that an economic impact analysis and mitigation plan to address the historic designation of CBT would be needed before any action could be taken by the Board of Directors with respect to the proposed expansion of CBT; and
 WHEREAS, ONCO engaged URS Greiner to conduct such capacity and economic impact study which was accepted and approved by the Board of Directors of the Port Authority on November 6, 1998 by Resolution No. 1998-53, and was subsequently submitted to the Cleveland Landmarks Commission and the Ohio Historic Preservation Office; and
 WHEREAS, the Board of Directors approved an Amended Mitigation Plan for CBT (the "Amended Plan") contingent upon the Cleveland Landmarks Commission's approval at its June 10, 1999 meeting; and
 WHEREAS, the Cleveland Landmarks Commission (the "Commission") did not approve the Amended Plan on June 10, 1999, but instead presented a modified Hulett proposal and Resolution dated July 8, 1999 at its July 9, 1999 meeting; and
 WHEREAS, the July 8, 1999 modified Hulett proposal and Resolution was approved by the Commission on July 9, 1999 (the "Approved Plan"), which Approved Plan has been presented to the Board of Directors and includes the following:
 1) The Commission granted a Certificate of Appropriateness for the demolition and removal of 2 Huletts and all buildings, subject to presentation of required documentation to the Commission;
 2) The Commission granted a Certificate of Appropriateness for disassembly and storage of 1 Hulett in the manner presented, to be retained on site for up to 5 years, for potential reassembly at a site within the Flats Oxbow district;
 3) A Certificate of Appropriateness for the demolition and removal of 1 addition (sic) Hulett was delayed until January 15, 2000 to permit fundraising efforts to allow for the disassembly of such Hulett;
 4) the Authority will pay to disassemble and store 1 Hulett and provide storage for 1 additional Hulett, if necessary, provided: (a) the cost to the Authority shall not exceed $500,000; and (b) if fundraising efforts to reconstruct the Hulett(s) on another site are successful, the Port Authority could be reimbursed a maximum of $250,000 from the fundraising and $50,000 from the City of Cleveland and $50,000 from ONCO.
 WHEREAS, the Board wishes to adopt the Approved Plan and provide funds necessary to implement same.
 NOW, THEREFORE, BE IT RESOLVED by the Cleveland-Cuyahoga County Port Authority Board of Directors, Cleveland, Ohio:
 Section 1. That the Approved Plan is hereby is (sic) approved, authorized and adopted.
 Section 2. That an expenditure not to exceed $500,000 is hereby authorized and approved to implement the Approved Plan, to be paid from the funds appropriated for Capital Improvements, subject to reimbursement as set forth in the Approved Plan.
 Section 3. That the implementation of the Approved Plan is hereby authorized and approved.
It is argued by Hauser that, in contrast to the Master Plan which did not allegedly discuss "what to do with the Huletts" and did not mention the fate of the power house or support buildings, see appellant's brief at 15 and 16, the three subsequent Port Authority Resolutions called for dispositional actions adverse to the Huletts and their support buildings' current condition by deciding "what to do" with the Huletts, their support buildings, and artifacts. It is through this distinction that Hauser complains that the Master Plan was improperly amended by the three subsequent Port Authority Resolutions. Appellant believes that it was necessary for the Master Plan to have detailed the fate and method of removal for the Huletts in order to give lawful effect to the subsequent Resolutions.
Appellant's view of a Master Plan is too limited. The Master Plan is not a detailed blueprint for the future development and improvement of the port and its facilities; excruciating detail and minutia in the plan is not what the Revised Code demands. Instead, the Master Plan is intended to be a general overview of the future envisioned for the port. This belief is buttressed by the language of R.C. 4582.07, which mandates:
 * * * a plan for the future development, construction, and improvement of the port and its facilities, including such maps, profiles, and other data and descriptions as may be necessary to set forth the location and character of the work to be undertaken by the port authority. (Italicization added.)
Had the General Assembly intended that the Master Plan be construed as requiring a detailed explanation of the work to be undertaken, it would have required more than the mere identification of the "location and character of the work to be undertaken by the port authority."
In the Master Plan sub judice, the Port Authority determined that the port needed to expand its current cargo throughput capacity and expand its bulk cargo facility on Whiskey Island. In analyzing the current problems with the CBT, the Master Plan stated the following:
Cleveland Bulk Terminals
 The first scenario denotes the throughout (sic) capacity under existing conditions. The second scenario analyzed the capacity without the Hulett Ore Unloaders in their current location. The focus of this scenario was not to address what to do with the Huletts, but to analyze the terminal operations if the Huletts were removed. The model results show that the Huletts limit the capacity by blocking an area that could be used for stacking cargo. The Huletts limit the CBT by restricting cargo transfer activities and also inhibit any type of transshipment vessel to vessel cargo transfer. If the Huletts remain, dock-side improvements will be required to allow the area behind the Huletts to be used for cargo stacking.[8]
 * * * Bulk Facilities
 Operations at the existing CBT are approaching capacity as a result of inadequate infrastructure. Much needed infrastructure improvements such as cargo handling equipment and improved road access are currently being planned by the Port and the terminal operator.
 These improvements will significantly increase the existing throughput capacity.
 The Master Plan improvements include the development of an additional 10 acres of storage area and 1,200 feet of wharf adjacent to the existing facility. Additional storage areas are proposed on the west side of the Cuyahoga River within a combination terminal in the Whiskey Island Marina area.
See 1998 Master Plan, at pages 12 and 27.
Clearly, the Master Plan identified a need for infrastructure improvements to aid throughput cargo capacity. The "location and character of the work to be performed" was iterated by the Master Plan when it identified the CBT on Whiskey Island as the scene for improvements and further mentioned the desirability of removing the Huletts from their current dockside location. It matters not that the Master Plan failed to mention disassembly of one or all of the Huletts and their support buildings since the Master Plan envisioned the removal of the offending structures; removal would impliedly subsume all methods of disposing of the structures from their dockside location in order to achieve the stated objective of improving the infrastructure of the CBT. The subsequent Port Authority Resolutions did not amend the Master Plan, therefore the Port Authority did not commit any procedural notice and hearing irregularity as alleged by Hauser. Accordingly, Hauser cannot prove any set of facts entitling him to relief and the trial court did not err in granting the motion to dismiss.
The assignments of error are overruled.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
ANNE L. KILBANE, J., and JAMES M. PORTER, J., CONCUR.
 _________________________________ JAMES D. SWEENEY, PRESIDING JUDGE
[1] See appellant's January 24, 2000 reply to Port Authority's motion to dissolve, at 4.
[2] R.C. 4582.07 provides the following:
4582.07 ADOPTION OF PLANS OF IMPROVEMENT
 The board of directors of a port authority shall prepare or cause to be prepared a plan for the future development, construction, and improvement of the port and its facilities, including such maps, profiles, and other data and descriptions as may be necessary to set forth the location and character of the work to be undertaken by the port authority. Upon the completion of such plan the board of directors shall cause notice by publication as provided in section 4582.01 of the Revised Code to be given in each county in which there is a political subdivision participating in the creation of the port authority, and shall likewise cause notice to be served upon the owners of the uplands contiguous to any submerged lands affected by such plan in the manner provided by law for service of notice in the levy of special assessments by municipal corporations, and shall permit the inspection thereof at their office by all persons interested. Said notice shall fix the time and place for the hearing of all objections to said plan, which shall be not less than thirty nor more than sixty days after the last publication of said notice and after service of notice upon the owners of such uplands. Any interested person may file written objections to such plan, provided such objections are filed with the secretary of the board of directors at his office not less than five days prior to the date fixed for said hearing. After said hearing the board of directors may adopt such plan with any modifications or amendments thereto as the official plan of the port authority.
[3] The Huletts were designated as local landmarks by the City of Cleveland effective June 23, 1993. See Cleveland Ordinance 816.93. The Huletts are ninety-six feet in height. See attachments to the complaint for writ of mandamus filed in case No. 391886. The Historical Mechanical Engineering Landmark plaque installed on the Huletts in 1998 by The American Society of Mechanical Engineers, described the Huletts as follows:
 HULETT IRON-ORE UNLOADERS 1912 The "Hulett," a highly efficient materials-handling machine unique to the Great Lakes, was invented by Clevelander George H. Hulett (1846-1923). The first, steam-powered and with a 10-ton-capacity grab bucket, went into service at Conneaut, Ohio, in 1899. It could unload an ore boat at the rate of 275 tons an hour.
 Like later Huletts, these were electrically powered. The various motions of the 17-ton bucket were controlled by an operator riding in a small cab in the vertical leg just above the bucket. Each machine could unload 1,000 tons an hour.
 The Hulett's clear superiority over existing mechanical unloaders revolutionized ore handling and led to its rapid adoption throughout the lower-lake ore ports. Through 1960, more than 75 were built by Cleveland's Wellman-Seaver-Morgan Co. and its predecessor and successor firms. With the advent of self-unloading ore boats, most have been dismantled. This battery is the largest and oldest of those that survive.
See Appellant's brief at Exhibit E.
[4] The leased premises were designated as the "Cleveland Bulk Terminals" aka "CBT."
[5] R.C. 4582.08 provides:
4582.08 MODIFICATION OF PLANS
 The board of directors shall, from time to time after the adoption of said official plan, have the power to modify, amend or extend the same, provided that upon the making of any such modification, amendment or extension thereof, the board of directors shall cause notice to be given and shall conduct a hearing, all as provided in section 4582.07 of the Revised Code, and shall not adopt any modification, amendment, or extension until the notice has been given and the hearing held as herein provided.
[6] A copy of Resolution 1998-28 is attached to appellant's brief at Exhibit F.
[7] Hauser has advised the court that the electrical power house has been razed. See appellant's brief at 9. The court also takes judicial notice that only the two easternmost Huletts remain standing on the site and that these two machines are slated for demolition and removal. The dismantling and on-site storage (for up to five years at an estimated cost of $637,000) of the two westernmost Huletts was authorized by the Cleveland Landmarks Commission, in consultation and agreement with various preservationist parties, on January 20, 2000. See City of Cleveland's amicus curiae brief filed January 21, 2000.
[8] Scenario One, for existing conditions, calculated a throughput cargo capacity of between 1.87 to 2.6 million short tons. Scenario Two, for full dockside access with Huletts removed, calculated a throughput cargo capacity of between 6.3 to 9.0 million short tons.